**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LARRY D. SMITH, SR.,** | : | **CIVIL ACTION NO. 1:04-CV-2231** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **ABF FREIGHT SYSTEMS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

### <u>MEMORANDUM</u>

This is an employment discrimination action filed by Larry D. Smith, Sr. ("Smith"), a former employee of defendant ABF Freight Systems, Inc. ("ABF"). Presently before the court is defendant's motion for summary judgment (Doc. 35). For the reasons that follow, the motion will be granted.

### I.   <u>Statement of Facts</u>[1]

On December 31, 1978, Smith began working as a truck driver in ABF's Carlisle, Pennsylvania terminal.  (Doc. 37 ¶ 6; Doc. 57 ¶ 6.)  During the course of his employment with ABF, Smith alleges that he was subjected to discrimination on the basis of disability and race[2] and that he was retaliated against for filing various complaints regarding the alleged discrimination.  The court will address the facts underlying each of Smith's claims *seriatim.*

---

[1] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to Smith.  <u>See</u> <u>infra</u> Part II.

[2] Smith is African-American.  (Doc. 19 ¶ 3; Doc. 22 ¶ 3.)

A.   **Smith's Disability Discrimination Claim**

In January of 1997, Smith suffered a heart attack, and a defibrillator was implanted in his chest.  Following a period of recovery, he returned to work in 1998. (Doc. 37 ¶ 8; Doc. 57 ¶ 8.)  Because of his heart condition, Smith failed the physical examination mandated by the Department of Transportation for truck drivers. (Doc. 37 ¶ 9; Doc. 57 ¶ 9.)  Accordingly, he was reassigned to the position of yard jockey upon his return.[3]  (Doc. 37 ¶ 10; Doc. 57 ¶ 10.)

Between 1998 and 1999, Smith worked as a yard jockey under medical restrictions imposed by his physician.  These restrictions prohibited him from lifting in excess of sixty pounds.  (Doc. 37 ¶ 11; Doc. 57 ¶ 11.)  In 1999, Smith suffered a second heart attack, which caused him to miss an extended period of work. (Doc. 37 ¶¶ 13-14; Doc. 57 ¶¶ 13-14.)  When Smith returned to his position as a yard jockey in 2000, his medical restrictions had been modified to prohibit him from

---

[3] A brief description of the duties of a yard jockey is as follows:

Yard jockeys must deliver inbound cargo trailers to the appropriate dock for the purpose of tear down, as well as pick up of outbound cargo trailers and stages on the yard as to allow proper delivery of cargo.  This job is accomplished by the coupling and uncoupling of trailers to either tractors or the yard mule.  The job entails constant moving in and out of a tractor and/or yard mule and constant hooking and unhooking of trailers, tractors, yard mules, or converter gears.

Work involves an element of personal danger and moderate levels of physical, emotional and mental stress . . .

(Doc. 37 ¶ 32; Doc. 57 ¶ 32.)

lifting in excess of forty pounds.[4]  (Doc. 37 ¶ 15; Doc. 57 ¶ 15.)  Smith admits that

ABF accommodated his medical condition at all times between 1998 and 2002.

(Doc. 37 ¶¶ 12, 16; Doc. 57 ¶¶ 12, 16.)

ABF yard jockeys must complete several different assignments, which

include cranking, fueling, stringing, hooking, inbound wagon, and jockey wagon.[5]

(Doc. 37 ¶ 35; Doc. 57 ¶ 35.)  Between 1998 and 2002, Smith was normally given the

inbound wagon assignment, but was occasionally given other assignments,

including hooking and fueling.  (Doc. 37 ¶¶ 69-71; Doc. 57 ¶¶ 69-71.)  In late 2002,

Smith's coworkers complained to supervisors John Roadcap ("Roadcap") and

Charles Gregory ("Gregory") about the fact that Smith was regularly given the

inbound wagon assignment.  (Doc. 37 ¶¶ 79-80; Doc. 57 ¶¶ 79-80.)  As a result,

Roadcap and Gregory informed Smith that they intended to give him other

assignments on occasion.  (Doc. 37 ¶ 81; Doc. 57 ¶ 81.)  The first such assignment

occurred on December 18, 2002, when Roadcap asked Smith to fuel.  Smith refused

---

[4] Smith claims that he informed ABF that his forty-pound lifting restriction also included a repetitive motion restriction but admits that the written information provided by his physician did not include such a restriction.  (Doc. 37 ¶¶ 75-76; Doc. 57 ¶¶ 75-76.)

[5] Smith admits that he is unable to complete the cranking, fueling, and stringing assignments because of a repetitive motion restriction.  (Doc. 37 ¶¶ 37, 39, 43; Doc. 57 ¶¶ 37, 39, 43.)  However, Smith contends that he is able to complete the hooking assignment, which involves attaching loaded trailers to tractors and preparing the tractor-trailers to leave the yard, and the inbound wagon and jockey wagon assignments, which require an employee to drive jockey wagons, attach them to trailers, and move the trailers to designated locations in the yard.  (Doc. 37 ¶¶ 40, 44, 46; Doc. 57 ¶¶ 40, 44-46; Doc. 44 at 20-22.)

the position because of his medical restrictions and left work after completing less than ten minutes of his assignment.  (Doc. 37 ¶ 85; Doc. 57 ¶ 85.)  On December 19, 2002, Roadcap again gave Smith an assignment other than inbound wagon, but agreed to give Smith the inbound wagon assignment the following day.  (Doc. 37 ¶ 86; Doc. 57 ¶ 86.)  On January 22 and 23, 2003, Gregory gave Smith the hooking assignment.  (Doc. 37 ¶¶ 87-90; Doc. 57 ¶¶ 87-90.)  Smith protested these assignments and asserted that the changes contravened his medical restrictions and constituted race discrimination.[6]  (Doc. 37 ¶ 82; Doc. 57 ¶ 82.)

On January 31, 2003, Smith's physician wrote ABF a letter increasing the severity of Smith's medical restrictions.  The letter prohibited Smith from "lifting objects heavier than 20 lbs." or completing "repetitive movement with his left arm " and "limit[ed] the rotation of [Smith's] left arm with more than 10 lbs. of pressure to no more than 10x per 8 hour shift."  (Doc. 37 ¶ 91; Doc. 57 ¶ 91.)  Based on these new medical restrictions, Terminal Manager Andy Upchurch ("Upchurch") met with Human Resources Director Dan Griesse ("Griesse") to discuss Smith's ability to perform yard jockey assignments.  (Doc. 37 ¶ 93; Doc. 57 ¶ 93.)  Griesse determined that Smith could not safely perform the essential functions of any yard jockey assignment with or without accommodation.  As a result, ABF placed Smith on

---

[6] Smith alleges that the changed assignments were prompted not by coworker concerns but by his complaints regarding race discrimination in the workplace, which were lodged in October and December of 2002.  See infra Part I.B.

4

unpaid leave on January 31, 2003.[7]  (Doc. 37 ¶ 94; Doc. 57 ¶ 94.)  On February 10, 2004, Smith retired from ABF.  (Doc. 37 ¶ 109; Doc. 57 ¶ 109.)  Smith characterizes his early retirement as a "constructive discharge."  (Doc. 19 ¶ 42.)

### B.   Smith's Race Discrimination Claim

Smith asserts that, in October of 2002, a fellow employee named Richard Silcox ("Silcox") intentionally parked his vehicle so close to Smith's vehicle that Smith was unable to enter the vehicle.  (Doc. 37 ¶ 20; Doc. 57 ¶ 20.)  An argument ensued during which Silcox, who is Caucasian, stated "Boy, you should learn how to park."  (Doc. 36-3 at 30.)  Smith, who considered the comment to be racially derisive, informed Roadcap about Silcox's remarks.  (Doc. 37 ¶¶ 21-23; Doc. 57 ¶¶ 21-23.)  Smith contends that ABF failed to investigate the matter or to take any disciplinary action against Silcox.  (Doc. 37 ¶ 24; Doc. 57 ¶ 24.)

Smith also asserts that, on December 19, 2002, a fellow employee named John Ivanoff ("Ivanoff") called him a "boy" and a "son of a bitch" and stated that someone should "kick his ass" for complaining about a Ku Klux Klan delivery that had occurred fifteen years earlier.[8]  (Doc. 37 ¶ 25; Doc. 57 ¶ 25.)  Supervisor Del Libby ("Libby") heard Ivanoff's inappropriate comments, prepared an incident

---

[7]  In 2001, Greisse concluded that Rod Garman ("Garman"), a Caucasian employee who sought to return to work with a twenty-pound lifting restriction, could not perform the essential functions of the yard jockey position with or without accommodation.  Accordingly, Greisse refused to permit Garman to return to work. (Doc. 37 ¶ 97; Doc. 57 ¶ 97.)

[8]  In 1987, ABF had allegedly required Smith to transport a truckload of Ku Klux Klan materials.  (Doc. 37 ¶ 17; Doc. 57 ¶ 17.)

report, and presented the report to Upchurch, who proceeded to question Smith. (Doc. 37 ¶¶ 26-27; Doc. 57 ¶¶ 26-27.)  Smith admits that he refused to reveal Ivanoff's identity to Upchurch because he feared that Ivanoff would file charges against him. However, Smith claims that he informed Upchurch that Libby knew Ivanoff's identity.  (Doc. 37 ¶¶ 28-29; Doc. 57 ¶¶ 28-29.)  Smith now claims that ABF failed to take appropriate disciplinary action against Ivanoff.  (Doc. 37 ¶ 30; Doc. 57 ¶ 30.)

### C. Smith's Retaliation Claim

In February of 2003, Smith filed grievances with his local union, alleging that he was placed on leave because of race and disability discrimination.  (Doc. 37 ¶ 110; Doc. 57 ¶ 110; Doc. 19 ¶ 51.)  Additionally, in March 2003, Smith filed a charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC").  (Doc. 37 ¶ 110; Doc. 57 ¶ 110.)  Because of the PHRC/EEOC filing, ABF placed Smith's grievances on hold, determining that it needed to investigate of all Smith's claims before responding in any forum.  (Doc. 37 ¶¶ 111, 115; Doc. 57 ¶¶ 111, 115.)  Ultimately, the grievances were all processed and denied by ABF and the union.  (Doc. 37 ¶¶ 120-21; Doc. 57 ¶¶ 120-21.)

### D. Procedural History

Smith filed the instant action pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e-2(a), 2000e-3(a), the Rehabilitation

Act, 29 U.S.C. § 701,[9] the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§§ 12101-12213, and the Pennsylvania Human Relations Act ("PHRA"), PA. STAT.

ANN. tit. 43, §§ 951-963.  (See Docs. 1, 19.)  Specifically, Smith alleges that ABF:

(1) discriminated against him on the basis of disability, (2) discriminated against

him on the basis of race, (3) created a racially hostile working environment,

(4) constructively discharged him, and (5) retaliated against him for asserting claims

of race and disability discrimination.  (Doc. 37 ¶ 1; Doc. 57 ¶ 1.)  Defendant filed the

instant motion for summary judgment (Doc. 35), alleging that Smith has failed to

proffer evidence sufficient to support any of his claims.  The motion has been fully

briefed and is ripe for disposition.

## II.  **Standard of Review**

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact" and for which a jury trial

would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  It places

the burden on the non-moving party to come forth with "affirmative evidence,

beyond the allegations of the pleadings," in support of its right to relief.  Pappas v.

---

[9] ABF argues that Smith's claim pursuant to the Rehabilitation Act fails because ABF is not an entity receiving federal financial assistance as required by the Rehabilitation Act.  (Doc. 36 at 15-16.)  In response, Smith fails to offer any argument to support his Rehabilitation Act claim.  (See Doc. 44 at 7-26 (failing to mention a Rehabilitation Act claim during the discussion of Smith's claims pursuant to the ADA)).  Accordingly, the court concludes that Smith has abandoned this claim.  See D'Angio v. Borough of Nescopeck, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999) (noting that abandonment of a position is tantamount to waiver); see also L.R. 7.6.  The court will grant ABF's motion for summary judgment with respect to the Rehabilitation Act claim without further discussion.

7

City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see

also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986);

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see

also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.   **Discussion**

Smith alleges that ABF discriminated against him on the basis of disability

and race and retaliated against him for filing various complaints regarding the

alleged discrimination.  The court will address these claims *seriatim*.

### A.   **Disability Discrimination**[10]

Smith claims that ABF violated the ADA by discriminating against him on

the basis of a physical disability.  The ADA prohibits an employer from

discriminating "against a qualified individual with a disability because of the

disability . . . in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms,

---

[10] Smith asserts claims of disability discrimination pursuant to the ADA and
the PHRA.  The United States Court of Appeals for the Third Circuit has held that
these claims are "properly evaluated as one statute" because "Pennsylvania courts
. . . generally interpret the PHRA in accord with its federal counterparts."  Conroy
v. Twp. of Lower Merion, 77 F. App'x 556, 560 (3d Cir. 2003); Rinehimer v.
Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002).  Accordingly, the court's discussion
of Smith's ADA claim also applies to his equivalent PHRA claim.

conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To establish a

*prima facie* case of discrimination under the ADA, a plaintiff must show:  "(1) he is a

disabled person within the meaning of the ADA; (2) he is otherwise qualified to

perform the essential functions of the job, with or without reasonable

accommodations by the employer; and (3) he has suffered an otherwise adverse

employment decision as a result of discrimination."  Benko v. Portage Area Sch.

Dist., No. 06-3457, 2007 WL 2041977, at *2 (3d Cir. July 17, 2007) (citing Taylor v.

Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)).

     The court turns first to the question of whether Smith meets the ADA

definition of "disability."  The ADA defines "disability" as:  (1) "a physical or mental

impairment that substantially limits one or more . . . major life activities," (2) "a

record of such an impairment," or (3) "being regarded as having such an

impairment."  42 U.S.C. § 12102(2); Marinelli v. City of Erie, 216 F.3d 354, 359 (3d

Cir. 2000).  The plaintiff bears the burden of proving that he or she meets this

definition of "disability."  See Bielek v. Allegheny Ludlum Corp., No. 04-1910, 2006

WL 2773487, at *12 (W.D. Pa. Sept. 22, 2006).  The United States Supreme Court has

stated that the plaintiff's burden is a difficult one and that the ADA's disability

definition must "be interpreted strictly to create a demanding standard for

qualifying as disabled."  Toyota Motor Mfg., Inc. v. Williams, 534 U.S. 184, 197

(2002).  Whether an individual is disabled within the meaning of the ADA must be

evaluated on a case-by-case basis and determined only after conducting "an

individualized assessment of the individual's limitations in his or her own experience."  Bielek, 2006 WL 2773487, at *12; Marinelli, 216 F.3d at 362.

In the instant case, Smith does not contend that he had a record of a disability or was regarded as disabled.  (See Doc. 44 at 7-26 (citing and arguing only the first prong of the disability definition)).  However, Smith clearly suffers from a serious cardiovascular disorder, which constitutes a physical impairment.  (Id.); see also 29 C.F.R. § 1630.2(h)(1) (listing cardiovascular disorders as an example of a physical impairment).[11]  Accordingly, the court need only consider whether Smith's cardiovascular disorder substantially limited a major life activity.

Major life activities are "those activities that are of central importance to daily life."  Toyota, 534 U.S. at 197.  Such activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i); see also Spencer v. Verizon Connected Solutions, Inc., 138 F. App'x 449, 451 (3d Cir. 2005).  The United States Court of Appeals for the Third Circuit has added "lifting" to this list of major life activities.

---

[11]  The court notes that the level of deference to be afforded to the EEOC's regulations and interpretive guidelines regarding the definition of "disability" remains undecided.  See Toyota, 534 U.S. at 194-95; Sutton v. United Air Lines, Inc., 527 U.S. 471, 479-80 (1999).  Because the parties to the instant action have offered no objection to the regulations' use as persuasive authority, the court will consider them accordingly.  See George v. Genuine Parts Co., No. 04-108, 2007 WL 217684, at *8 n.3 (W.D. Pa. Jan. 25, 2007) ("Courts in this district routinely apply the EEOC's guidelines and, the Parties having offered no objection, this Court feels no need to do differently."); see also Williams v. Phila. Housing Auth. Police Dept., 380 F.3d 751, 762 n.7 (3d Cir. 2004) (applying the EEOC regulations because neither party to the action challenged their reasonableness).

Marinelli, 216 F.3d at 363.  When Smith was deposed regarding the effect of his

disability, he responded as follows:

> Q      With respect to disability, what did you consider to be your disability at
>        the time you filed that charge?
> A      My disability was my heart and the fact that I have a defibrillator
>        implanted, which restricted me from doing certain things, such as
>        heavy lifting and no more commercial driving of a truck.  And no
>        repetitive motion of my left arm.
> Q      Anything else?
> A      That's all.

(Doc. 36-3 at 31.)  The court interprets this testimony to allege limitations in the

major life activities of lifting, performing manual tasks, and working.[12]

---

[12] In an unsworn declaration, Smith now claims that his disability limits his
ability to walk greater than fifty feet, climb stairs or any degree of incline, bend, and
engage in sexual intercourse.  (Doc. 44-7 ¶ 10.)  Smith's brief in opposition further
increases the severity of his disability, claiming for the first time that Smith has
difficulty sustaining a heart beat, maintaining consciousness, and sleeping.  (Doc. 44
at 12, 14.)  Smith's unsworn declaration and the additional averments of his brief
constitute precisely the type of post-deposition remembrances that tax judicial
resources in the disposition of motions for summary judgment.  The Third Circuit
has stated that a party is prohibited from creating a genuine issue of material fact
by "disputing his or her own sworn testimony without demonstrating a plausible
explanation for the conflict."  Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004).  Such
explanations may come in the form of "independent evidence in the record to . . .
establish that the [party] was 'understandably' mistaken, confused, or not in
possession of all the facts during the previous deposition."  Jiminez v. All Am.
Rathskeller, Inc., No. 06-3670, 2007 WL 2743431, at *6 (3d Cir. Sept. 21, 2007).  Smith
cannot present such an explanation in the instant case.  During his deposition,
Smith was specifically questioned about what he considered to be his disability.
When Smith responded by listing the ramifications of his disability, he was asked if
that list was complete, and he confirmed that it was.  There is no evidence of record
to suggest that Smith was unaware of or confused about the ramifications of his
disability at the time he was questioned.  Moreover, the numerous letters provided
by Smith's physicians confirm the scope of Smith's disability as detailed in his
deposition testimony.  (See Doc. 36-6 at 7-8, 11, 23-24 (stating that Smith has
difficulty lifting, completing repetitive activities with his left arm, and driving, but
that Smith is "able to walk and bend")).  For the foregoing reasons, the court will

To prevail on his ADA claim, Smith must prove that he is substantially limited in his performance of one of these three major life activities. A substantial limitation makes an individual: (1) "unable to perform a major life activity that the average person in the general population can perform, or (2) "significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). In other words, a disability must be "extremely limiting" to qualify for protected status under the ADA. Marinelli, 216 F.3d at 362. The Third Circuit employs a two-step analysis for determining whether an individual is substantially limited in a major life activity. See Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 783-84 (3d Cir. 1998); see also Shaw v. Chamberlain Mfg. Corp., No. 05-1344, 2006 WL 2382284, at *7 (M.D. Pa. Aug. 17, 2006). First, the court determines whether the individual is substantially limited in any major life activity other than working. If the individual has such a limitation, the inquiry ends there. However, if

---

not accept Smith's declaration or the additional averments of his brief, which are designed to create a sham fact issue. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806-07 (1999); see also Wm. A. Graham Co. v. Haughey, 484 F. Supp. 2d 324, 326 (E.D. Pa. 2007) (extending sham affidavit doctrine to declarations).

Assuming *arguendo* that the court were to accept the aforementioned facts, Smith's ADA claim would still fail because he would be unable to prove that he was qualified for the position of yard jockey. An individual is qualified for a position if he or she can perform the essential functions of that position with or without reasonable accommodation. 42 U.S.C. § 12111(8); see also 29 C.F.R. § 1603.2(m). Among the essential functions of Smith's former position with ABF is the ability to drive heavy equipment, including jockey wagons and trailers. Clearly, Smith's purported inability to maintain consciousness and sustain a heart beat would preclude him from performing these functions.

the individual has no such limitation, the court's second inquiry is whether the individual is substantially limited in the major life activity of working.  Id.

Given the aforementioned framework, the court will analyze whether Smith is substantially limited in the major life activities of lifting and performing manual tasks before considering the major life activity of working.  With respect to lifting, the Third Circuit has held that the inability to lift more than ten pounds does not render an individual "sufficiently different from the general population such that he is substantially limited in his ability to lift."  Marinelli, 216 F.3d at 364; see also Shaw, 2006 WL 2382284, at *7 (recognizing that lifting is major life activity but holding that ten to twenty-five pound lifting restriction is not a substantial limitation).  When Smith was given a leave of absence from his position at ABF, his physician stated that he was able to lift up to twenty pounds, which is double the ten pound restriction that the Marinelli count found insufficient to constitute a substantial limitation.  (Doc. 37 ¶ 91; Doc. 57 ¶ 91); see also Marinelli, 216 F.3d at 364.  Accordingly, the court finds that Smith was not substantially limited in the major life activity of lifting.

The court turns next to the major life activity of performing manual tasks.  The United States Supreme Court has stated that to be substantially limited in performing manual tasks, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Toyota, 534 U.S. at 198.  The key inquiry is "whether the claimant is unable to perform the variety of tasks central to most people's daily

lives, not whether the claimant is unable to perform the tasks associated with [his or her] specific job." Id. at 200-01. This is because the manual tasks that are unique to a particular job are unlikely to be important parts of most people's daily lives. Id. at 201. For example, in Toyota, the Court concluded that "repetitive work with hands and arms extended at or above shoulder levels for extended periods of time" was not an important part of most people's daily lives. 534 U.S. at 201; see also Aurigue v. Potter, 45 F. App'x 692, 694 (9th Cir. 2002) (holding that "the ability to perform manual, repetitive work for extended periods of time . . . is not an important part of most people's daily lives"); Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 726-27 (5th Cir. 1995) (holding that the inability to perform "heavy lifting and repetitive rotational movements" does not result in a substantial limitation of the major life activity of performing manual tasks). Instead, the Court cited such things as "household chores, bathing, and brushing one's teeth" among the manual tasks appropriate for consideration. Toyota, 534 U.S. at 202. In the instant case, Smith alleges that he is unable to perform repetitive motions with his left arm. Specifically, Smith's medical restrictions limit the rotation of his left arm "with more than 10 lbs. of pressure to no more than 10x per 8 hour shift." (Doc. 37 ¶ 91; Doc. 57 ¶ 91.) Like the plaintiff in Toyota, Smith has limitations that are solely work-related and that do not involve tasks that are central to most people's daily lives. See 534 U.S. at 201. Therefore, Smith was not substantially limited in the major life activity of performing manual tasks.

14

Having found that Smith is not substantially limited in any other major life activity, the court will turn to the major life activity of working. An individual is substantially limited in the major life activity of working if he or she is significantly restricted in his or her "ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3); see also Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 517 (1999). Even a complete inability to perform a single job does not warrant a finding that the plaintiff has a disability. Horth v. Gen. Dynamics Land Sys., Inc., 960 F. Supp. 873, 878 (M.D. Pa. 1997); see also 29 C.F.R. Pt. 1630, App. In determining whether a plaintiff is unable to perform a class of jobs or a broad range of jobs, the court should consider the following factors: (1) "the geographical area to which the individual has reasonable access," (2) "the job from which the individual has been disqualified because of an impairment," and (3) "the number and types of jobs . . . within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(2)-(3); see also Andino v. Phila. Hous. Auth., No. 05-2161, 2007 WL 2254427, at *10 (E.D. Pa. Aug. 6, 2007).

In the instant case, Smith has failed to submit evidence to support his claim that his cardiovascular impairment significantly restricts his ability to perform a class of jobs or a broad range of jobs in various classes. The evidence of record does not address the geographical area to which Smith has access or the number and types of jobs from which Smith is disqualified because of his impairment. Given the

state of the record, no reasonable jury could conclude that Smith's impairment rendered him unable to perform a class of jobs or a broad range of jobs in various classes.  See Parker v. City of Williamsport, 406 F. Supp. 2d 534, 546-47 (M.D. Pa. 2005) (holding that in the absence of the aforementioned evidence "no reasonable jury could find [the plaintiff] substantially impaired in the major life activity of working"); Hodson v. Alpine Manor, Inc., No. 03-374, 2007 WL 1491410, at *14 (W.D. Pa. May 21, 2007) (same); Merit v. Se. Pa. Transit Auth., 315 F. Supp. 2d 689, 700-01 (E.D. Pa. 2004), affirmed, 122 F. App'x 598 (3d Cir. 2005) (same); Lukens v. Nat'l R.R. Passenger Corp., No. 99-4102, 2000 WL 1622745, at *5 (E.D. Pa. Oct. 25, 2000) (same); Dutcher, 53 F.3d at 727 n.13 (same); see also Aurigue, 45 F. App'x at 695 (holding that plaintiff's "conclusory allegations" regarding her inability to work were insufficient, absent evidence concerning job market demographics).

As the Third Circuit has stated, "Congress did not intend for the ADA to protect all individuals who suffer from medical difficulties; rather, Congress desired to shield from adverse employment actions those individuals whose medical troubles prevented them from engaging in significant daily activities." Marinelli, 216 F.3d at 364-66.  While Smith suffers from a serious cardiovascular impairment, he has failed to proffer sufficient evidence to establish that he is disabled as defined by the ADA.  Accordingly, Smith is unable to establish a *prima facie* case of disability discrimination, and defendant's summary judgment motion will be granted with respect to this claim.

16

B.      **Race Discrimination**[13]

Smith's race discrimination claim is premised on three theories, namely

disparate treatment, hostile work environment, and constructive discharge.  The

court will discuss these theories *seriatim*.

1.      **Disparate Treatment Theory**

Smith alleges that he was subjected to disparate treatment because of his

race.  To withstand a motion for summary judgment on a disparate treatment claim,

a plaintiff must establish that his or her "protected trait 'played a role in the

employer's decisionmaking process and had a determinative influence on the

outcome of that process.'"  Ulitchney v. Potter, No. 04-991, 2006 WL 1722391, at *2

(M.D. Pa. 2006) (quoting Monaco v. Amer. Gen. Assurance. Co., 359 F.3d 296, 300 (3d

Cir. 2004)).  A plaintiff may meet this burden with either direct evidence, see Price

Waterhouse v. Hopkins, 490 U.S. 228 (1989) (O'Connor, J., concurring), or

circumstantial evidence, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

(1973).  In the instant case, Smith has not provided direct evidence of

_____

[13]  Title VII, § 1981, and PHRA claims of race discrimination are evaluated
pursuant to identical standards.  See Clegg v. Falcon Plastics, Inc., 174 F. App'x 18,
24 n.6 (3d Cir. 2006) (comparing Title VII and PHRA hostile work environment
claims); Verdin v. Weeks Marine, Inc., 124 F. App'x 92, 96 (3d Cir. 2005) (comparing
Title VII and § 1981 hostile work environment claims); Jones v. Sch. Dist. of Phila.,
198 F.3d 403, 410 (3d Cir. 1999) (comparing Title VII, § 1981, and PHRA disparate
treatment claims); Glenn v. Horgan Bros., Inc., No. 03-6578, 2005 WL 1503428, at *2
(E.D. Pa. June 24, 2005) (comparing Title VII, § 1981, and PHRA constructive
discharge claims).  Accordingly, the court's discussion of Smith's claims pursuant to
Title VII applies equally to Smith's § 1981 and PHRA claims.

discrimination;[14] therefore, the court will examine his claims using the three step

burden-shifting analysis set forth in <u>McDonnell Douglas</u>.

Under <u>McDonnell Douglas</u>, a plaintiff must first establish a *prima facie* case

of discrimination by proving the following elements:  (1) the plaintiff is a member of

a protected class, (2) the plaintiff was qualified for the position he held or sought,

(3) the plaintiff suffered an adverse employment action, and (4) the circumstances of

the adverse employment action give rise to an inference of discrimination.  <u>Johnson</u>

<u>v. Keebler-Sunshine Biscuits, Inc.</u>, No. 06-3219, 2007 WL 215801, at *2 (3d Cir. 2007);

<u>Connors v. Chrysler Fin. Corp.</u>, 160 F.3d 971, 974 (3d Cir. 1998).  Once the *prima*

*facie* case is established, the burden shifts to the defendant to articulate some

"legitimate, nondiscriminatory reason" for the plaintiff's treatment.  <u>Iadimarco v.</u>

<u>Runyon</u>, 190 F.3d 151, 157 (3d Cir. 1999) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802);

<u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997).  The

---

[14]  Direct evidence is evidence that proves that "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." <u>Price Waterhouse</u>, 490 U.S. at 277.  An employer who discriminates "will almost never announce a discriminatory animus or provide employees or courts with direct evidence of discriminatory intent." <u>Iadimarco v. Runyon</u>, 190 F.3d 151, 157 (3d Cir. 1999).  Therefore, a plaintiff who wishes to establish a *prima facie* case of discrimination using direct evidence "faces a high hurdle." <u>Connors v. Chrysler Fin. Corp.</u>, 160 F.3d 971, 976 (3d Cir. 1998).  The court has found no evidence of record to suggest that Smith has cleared this hurdle in the instant action.  While the evidence of record suggests that two of Smith's coworkers made racially derisive comments, neither of these coworkers had the authority to make employment decisions that would affect Smith.  Such "[s]tray remarks by non-decisionmakers" do not constitute direct evidence of discrimination because they are insufficient to suggest that ABF's employment decisions were based upon Smith's race. <u>Windfelder v. The May Dep't Stores Co.</u>, 93 F. App'x 351, 355 (3d Cir. 2004).

defendant's burden to prove a legitimate non-discriminatory reason is "relatively light." <u>Johnson</u>, 2007 WL 215801, at *3. The defendant is only required to prove that its actions could have been motivated by the proffered legitimate, nondiscriminatory reason; proof of actual causation is not required. <u>Iadimarco</u>, 190 F.3d at 157. Once the defendant has met its burden, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination." <u>Johnson</u>, 2007 WL 215801, at *2. The plaintiff may meet this burden by presenting evidence from which a reasonable factfinder could "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Keller</u>, 130 F.3d at 1108.

Turning to the *prima facie* case, ABF's argues that Smith has not presented sufficient evidence to give rise to an inference of discrimination. (<u>See</u> Doc. 36 at 29-30.) A plaintiff can establish an inference of discrimination where he or she was "treated differently than similarly-situated, non-protected employees." <u>Johnson</u>, 2007 WL 215801, at *2. Similarly-situated employees are those who "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." <u>Ogden v. Keystone Residence</u>, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002); <u>see also</u> <u>Red v. Potter</u>, No. 05-5256, 2006 WL 3349563, at *2 (3d Cir. 2006) (stating that "in order to

show that an employee is 'similarly situated,' all of the relevant aspects of employment need to be nearly identical"). In the action *sub judice*, the only individual outside of his protected class whom Smith identifies as similarly situated is Garman. See <u>supra</u> note 7. Assuming *arguendo* that Garman and Smith are similarly situated, Smith cannot prove that he was treated differently than Garman. To the contrary, both Smith and Garman were informed that they would not be permitted to return to work with a twenty-pound lifting restriction because they could not perform the essential functions of the yard jockey position with or without accommodation. <u>Id.</u> Accordingly, Smith's attempt to identify similarly situated individuals who were treated differently fails to give rise to an inference of race discrimination.

To establish an inference of race discrimination, Smith also relies upon his coworkers' use of the word "boy." In <u>Ash v. Tyson Foods, Inc.</u>, 546 U.S. 454 (2006), the United States Supreme Court held that a supervisor's references to African-American employees as "boy" could establish an inference of race discrimination when that supervisor later denied the same employees a promotion. <u>Id.</u> at 456. While the case *sub judice* involves the same pejorative word used by the supervisor in <u>Ash</u>, an inference of discrimination does not arise here because it was uttered by non-decisionmakers, in two isolated incidents, and cannot be attributed *any* of Smith's supervisors. See <u>Walden v. Georgia-Pacific Corp.,</u> 126 F.3d 506, 521 (3d Cir. 1997) ("We have generally held that comments by those individuals outside of the decisionmaking chain are stray remarks, which, standing alone, are inadequate to

support an inference of discrimination."); see also Hartwell v. Lifetime Doors, Inc.,

No. 05-2115, 2006 WL 381685, at *10 (E.D. Pa. Feb. 16, 2006).    For the foregoing

reasons, the court finds insufficient evidence to establish an inference of

discrimination on the basis of race.  Because Smith has failed to establish a *prima*

*facie* case of discrimination, defendant's motion for summary judgment will be

granted.[15]

## 2.    Hostile Work Environment Theory

A hostile work environment exists when "the workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive

working environment."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-16

---

[15] Assuming *arguendo* that Smith had established a *prima facie* case of
discrimination, his claim would still fail for lack of evidence of pretext.  Defendant
has produced sufficient evidence that Smith was placed on leave for the legitimate
non-discriminatory reason that he was unable to perform his job with a twenty-
pound lifting restriction and a repetitive motion restriction.  Proving pretext places
a "difficult burden" on the plaintiff.  Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d
378, 386 (3d Cir. 1999).  The plaintiff must show "not merely that the employer's
proffered reason was wrong, but that it was so plainly wrong that it cannot have
been the employer's real reason."  Keller, 130 F.3d at 1109.  Smith's claim of pretext
is limited to a footnote in his opposition brief, wherein he suggests that ABF's
alleged refusal to confer with him about how to accommodate his disability
establishes that the decision to place him on leave was pretextual.  (Doc. 44 at 35
n.8.)  At best, Smith's allegation could establish that ABF failed to conduct a
thorough investigation before placing Smith on leave.  However, it is not for the
court to determine whether ABF "made the best, or even a sound, business
decision" when it chose to place Smith on leave.  Simpson v. Kay Jewelers, 142 F.3d
639, 647 (3d Cir. 1998).  The court's only concern is whether the "real reason" for
ABF's decision was an intent to discriminate against Smith on the basis of race.  Id.
Smith has simply failed to proffer any evidence that would suggest an invidious
motive.

(2002).  Hostile work environment claims differ from other discrimination claims in

that they are based upon "the cumulative effect of individual acts," rather than on

the individual acts themselves.  Id. at 115.  To prevail on a hostile work environment

claim, a plaintiff must prove that:  (1) he or she suffered intentional discrimination

because of his or her membership in a protected class, (2) the discrimination was

severe or pervasive,[16] (3) the discrimination detrimentally affected the plaintiff,

(4) the discrimination would have detrimentally affected a reasonable person of the

same protected class in that position, and (5) the existence of *respondeat superior*

liability.  Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001).  In determining

whether a plaintiff has established a valid hostile work environment claim, a court

should consider the totality of the circumstances, including "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance."  Morgan, 536 U.S. at 116; see also Aman v.

Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (1996).  These considerations must

be made in the context of the plaintiff's particular work environment, paying

"careful consideration [to] the social context in which particular behavior occurs

and is experienced by its target."  Boyer v. Johnson Matthey, Inc., No. 02-8382, 2005

---

[16]  The Third Circuit originally stated this element as the conjunctive
"pervasive and regular," but later changed the standard to conform with the
Supreme Court's use of the disjunctive "severe or pervasive."  See Jensen v. Potter,
435 F.3d 444, 449 n.3 (3d Cir.), overruled in part on other grounds, Burlington N. &
Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006).

WL 35893, at *13 n.18 (E.D. Pa. Jan. 6, 2005) (quoting Oncale v. Sundowner Offshore

Servs., Inc., 523 U.S. 75, 81 (1998)).

    In support of his hostile work environment claim, Smith relies upon the

racially derisive statements of his coworkers and his supervisors' alleged refusal to

address his complaints regarding these statements. (See Doc. 44 at 36.) The court

finds these facts insufficient to establish that the alleged discrimination was

"sufficiently severe or pervasive to alter the terms and conditions of [Smith's]

employment and create an abusive working environment." Page v. Trustees of the

Univ. of Pa., 222 F. App'x 144, 146 (3d Cir. 2007) (quoting Meritor Sav. Bank, FSB v.

Vinson, 477 U.S. 57, 67 (1986)). For racially derisive comments to give rise to a

hostile work environment, there must be "more than a few isolated incidents of

racial enmity, meaning that instead of sporadic racist slurs, there must be a steady

barrage of opprobrious racial comments." Boyer, 2005 WL 35893, at *16-*17

(finding insufficient evidence to establish pervasive and regular discrimination

where co-workers referred to plaintiff as "boy" five times over a two and one-half

year period); see also Drinkwater v. Union Carbide Corp., 904 F.2d 853, 863 (3d Cir.

1990) ("Hostile environment harassment claims must demonstrate a continuous

period of harassment, and two comments do not create an atmosphere."). The

derisive statements of which Smith complains were infrequent, occurring only

twice in Smith's twenty-five year history of employment with ABF. That the

employees who made these statements allegedly went unpunished does not alter

the fact that the incidents were too infrequent to be considered severe or pervasive.

Accordingly, Smith's hostile work environment claim fails, and the court will grant ABFs motion for summary judgment with respect to that claim.

### 3.   **Constructive Discharge Theory**

To establish a valid constructive discharge claim, a plaintiff must prove that his or her employer knowingly permitted a discriminatory condition so intolerable that a reasonable person would have felt compelled to resign. <u>Duffy v. Paper Magic Group, Inc.</u>, 265 F.3d 163, 167 (3d Cir. 2001). "Creation of a hostile work environment is a necessary predicate" to a constructive discharge claim. <u>Pa. State Police v. Suders</u>, 124 S. Ct. 2342, 2356 (2004); <u>see also</u> <u>Harrison v. Hous. Auth. of City of Pittsburgh</u>, 111 F. App'x 95, 97 (3d Cir. 2004) (citing <u>Konstantopoulos v. Westvaco Corp.</u>, 112 F.3d 710, 718 (3d Cir. 1997)). Given the court's conclusion that Smith was not subjected to a hostile work environment on the basis of race, his constructive discharge claim must also fail. <u>See</u> <u>supra</u> Part III.B.2. Accordingly, the court will grant ABF's motion for summary judgment with respect to Smith's claim that he was constructively discharged.

## C.   <u>Retaliation</u>[17]

To state a *prima facie* case of retaliation, a plaintiff must allege that:  (1) he or she engaged in a protected activity, (2) the employer subjected him or her to an adverse employment action, and (3) "a causal link exists between the protected activity and the adverse action."  <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 430 (3d Cir. 2001); <u>see also</u> <u>Aguiar v. Morgan Corp.</u>, 27 F. App'x 110, 112 (3d Cir. 2002); <u>Glenn v. Horgan Bros., Inc.</u>, No. 03-6578, 2005 WL 1503428, at *2 (E.D. Pa. June 24, 2005).  If a plaintiff establishes a *prima facie* case of retaliation, <u>McDonnell Douglas</u> burden-shifting applies:  "'[T]he burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action.'  If the employer advances such a position, the burden shifts back to the employee to prove that the non-discriminatory explanation is merely a pretext for discrimination."  <u>Moss v. Potter</u>, 175 F. App'x 570, 571 (3d Cir. 2006) (citing <u>McDonnell Douglas</u>, 411 U.S. 792).

In the instant case, Smith alleges that he engaged in a protected activity when he:  (1) complained to his supervisors about his coworkers' racist statements in October and December of 2002, and (2) filed a PHRC/EEOC claim protesting his work assignments in March of 2003.  Assuming *arguendo* that these actions

---

[17]   The Third Circuit has held that the anti-retaliation provisions of Title VII, § 1981, the ADA, and the PHRA are "governed by the same set of precedents." <u>Fogleman v. Mercy Hosp., Inc.</u>, 283 F.3d 561, 567-68 (3d Cir. 2002); <u>Schurr v. Resorts Int'l Hotel, Inc.</u>, 196 F.3d 486, 499 (3d Cir. 1999); <u>see also</u> 42 U.S.C. § 12203(a) (ADA retaliation provision); 42 Pa. Cons. Stat. Ann. § 955(d) (PHRA retaliation provision).  Accordingly, the court will evaluate each of Smith's retaliation claims according to the principles set forth below.

constitute protected activities, Smith's retaliation claim fails for lack of evidence

that such activities prompted adverse employment actions.

To establish an adverse employment action, "a plaintiff must show that a

reasonable employee would have found the challenged action materially adverse,

which in this context means it well might have dissuaded a reasonable worker from

making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry.

Co. v. White, 126 S. Ct. 2405, 2415 (2006); see also Moore v. City of Phila., 461 F.3d

331, 341 (3d Cir. 2006). In the action *sub judice*, Smith claims that his complaints

regarding his coworkers' racist statements gave rise to changes in his work

assignments and that his PHRC/EEOC filing prompted ABF to delay the processing

of his grievances.[18] (Doc. 44 at 26-28.)

The court turns first to the changes in Smith's work assignments. A

"reassignment of job duties is not automatically actionable" as a retaliation claim.

See Burlington, 126 S. Ct. at 2417. To determine whether a reassignment

––––––––––––––––––––––––

[18] It remains unclear whether Smith intends to base his retaliation claim upon ABF's decision to place him on unpaid leave. If he were to posit such a claim, it would fail for lack of causation. A retaliation plaintiff must prove, *inter alia*, that the individual who took the adverse action knew of the plaintiff's protected activity. See Iyer v. Everson, No. 06-1539, 2007 WL 2220446, at *2 (3d Cir. Aug. 3, 2007) (dismissing retaliation claim for lack of causation absent evidence that decisionmaker knew about protected activity at time of adverse employment action); Morris v. Cornell & Co., No. 04-4678, 2006 WL 2376742, at *5 (D.N.J. Aug. 16, 2006) (same); Allen v. Nat'l R.R. Passenger Corp., No. 03-3497, 2005 WL 2179009, at *12 (E.D. Pa. Sept. 6, 2005) (same); see also Webb v. Level 3 Communications, LLC, 167 F. App'x 725, 735 (10th Cir. 2006) (same). In the instant case, Griesse made the decision to place Smith on leave, and Smith has proffered no evidence to suggest that Griesse knew of Smith's complaints of racism at the time he made that decision.

constitutes an adverse employment action, the court must consider the

reassignment "from the perspective of a reasonable person in the plaintiff's

position, considering 'all the circumstances.'" Id. The court finds that a reasonable

person in Smith's position would not have found the change materially adverse.

There is no evidence of record to suggest that Smith had ever been guaranteed his

desired assignment.  In fact, Smith admitted that he had been called upon to

perform several of the other yard jockey assignments on numerous occasions before

he engaged in the protected activity that forms the basis of his retaliation claim.

(See Doc. 37 ¶¶ 69-71; Doc. 57 ¶¶ 69-71.)  Moreover, Smith's reassignment to other

job duties was not permanent.  To the contrary, he was asked to perform other job

duties on only four occasions and was permitted to have his desired position the

majority of the time.  (See Doc. 37 ¶¶ 85-90; Doc. 57 ¶¶ 85-90.)  Finally, Smith has

proffered no evidence to suggest that a reasonable person in his position would

have considered his desired position "easier or more agreeable" than the duties to

which he was later assigned.  See Burlington, 126 S. Ct. at 2416.  While Smith's

reassignments may have served as a minor inconvenience to him, the court finds

that a reasonable person in Smith's position would not have found the changes so

materially adverse as to prevent him from making or supporting a charge of

unlawful discrimination.

The court turns next to ABF's delay in the processing of Smith's grievances.

ABF contends that the delay was prompted by the need to investigate Smith's

grievances together with his PHRC/EEOC claim.  (Doc. 37 ¶¶ 111, 115; Doc. 57

¶¶ 111, 115.)  The court finds no evidence of record to suggest that this delay had any adverse effect on Smith.  Smith argues that the delay lengthened his leave of absence (see Doc. 44 at 28-29); however, the court finds this argument unavailing because Smith's grievances were ultimately processed and denied by ABF (see Doc. 37 ¶¶ 120-21; Doc. 57 ¶¶ 120-21).  Even if ABF had issued its decision earlier, Smith would not have been reinstated and his leave of absence would have continued.  Because the delay had no ultimate effect on Smith, the court finds that a reasonable person in Smith's position would not have been deterred from making or supporting a charge of unlawful discrimination.

Assuming *arguendo* that Smith had suffered an adverse employment action, his claims would still fail for lack of evidence of causation.  To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity "played some substantial role" in motivating the adverse employment action.  Meenan v. Harrison, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D. Pa. Apr. 13, 2006).  The temporal proximity of an adverse action to a plaintiff's involvement in protected activity is probative of the causation element of a retaliation claim.  Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003).  However, a protected activity and an adverse employment action must be "very close" in time to prove causation.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (stating that three month period between protected activity and adverse employment action did not suggest causation).  In the action *sub judice*, Smith's complaint in October of 2002 was followed by an adverse employment

28

action on December 18, 2002.  Likewise, Smith's PHRC/EEOC filing in March of

2003 was followed by a delay in the processing of his grievances in August of 2003.

Hence, the difference in time between Smith's protected activities and the

corresponding adverse employment actions is one and one-half months and five

months, respectively.  The court finds that the temporal proximity between Smith's

protected activities and the resultant adverse employment actions is not so unduly

suggestive as to give rise to an inference of causation.  See Breeden, 532 U.S. at 273-

74.  Having found that Smith has failed to establish the adverse employment action

and causation elements of the *prima facie* case, the court will grant summary

judgment in favor of ABF on Smith's retaliation claims.

## IV.   Conclusion

For the foregoing reasons, the court will grant defendant's motion for

summary judgment, and this case will be closed.

An appropriate order will issue.


    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:      October 29, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LARRY D. SMITH, SR.,** | : | **CIVIL ACTION NO. 1:04-CV-2231** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **ABF FREIGHT SYSTEMS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

AND NOW, this 29th day of October, 2007, upon consideration of the motion

for summary judgment (Doc. 35), and for the reasons set forth in the accompanying

memorandum, it is hereby ORDERED that:

1.  Defendant's motion for summary judgment (Doc. 35) is GRANTED.
    See FED. R. CIV. P. 56(c).

2.  The Clerk of Court is directed to enter JUDGMENT against plaintiff
    and in favor of defendant ABF Freight Systems, Inc.

3.  The Clerk of Court is directed to CLOSE this case.


     S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge